UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DAVID NORTON and AKIKO NORTON, <br><br> Plaintiffs, <br><br> v. <br><br> RHODE ISLAND HOUSING AND MORTGAGE FINANCE CORPORATION, <br><br> Defendant. | C.A. No. 1:25-cv-00029-MSM-AEM |

ORDER

David and Akiko Norton, pro se, originally sued Rhode Island Housing and Mortgage Finance Corporation ("R.I. Housing") in Rhode Island state court for claims arising from its alleged mismanagement of escrow funds for their mortgage. (ECF No. 1-1.) R.I. Housing removed the case to this Court, and the Nortons amended their Complaint. (ECF No. 1; No. 8.) R.I. Housing now moves to dismiss the case, arguing that the Amended Complaint fails to state any plausible claims under Fed. R. Civ. P. 12(b)(6). (ECF No. 16.) The Nortons, in turn, move for a jury trial. (ECF No. 14.)

For the reasons below, R.I. Housing's Motion is GRANTED as to the federal claim. The Court declines to exercise supplemental jurisdiction over the remaining state-law claims, so they are REMANDED to state court for further proceedings. The Court thus declines to address the Nortons' Motion for a Jury Trial.

This case started with the Nortons' acquisition of a mortgage from R.I. Housing in September 2023. (ECF No. 8 ¶ 8.) R.I. Housing established an escrow account as part of the Nortons' mortgage agreement, requiring it to manage escrow funds for designated purposes, including property taxes and insurance. *Id.* ¶ 9. The Nortons received a $17,500 down payment assistance grant from R.I. Housing as part of the mortgage agreement. *Id.* ¶ 10.

On September 25, 2024, the Nortons "discovered irregularities" in their escrow account, "including the unexplained notation of 'escrow funds to borrower' in the amount of $3,902.91." *Id.* ¶ 11; *see also* ECF No. 8-1 at 2.[1] The Nortons "believe" that this "overage/surplus originated from the $17,500 down payment assistance grant and was improperly allocated to their escrow account instead of being applied directly to their mortgage." (ECF No. 8 ¶ 12.) The Nortons also received an annual escrow account statement dated September 18, 2024, which "stated a surplus that would be paid to Plaintiffs" in the amount of $3,902.91. *Id.* ¶ 14; *see also* ECF No. 8-

---

[1] "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alt. Energy, Inc. v. St. Paul Fire and Marine Ins.*, 267 F.3d 30, 33 (1st Cir. 2001). But exceptions exist "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (internal quotation omitted). As a result, "when the complaint relies upon a document, whose authenticity is not challenged, such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." *Id.* (cleaned up). Here, no one challenges the validity of the referenced documents, so the Court can properly consider them because they are "central" to the claims and "sufficiently referred to in the complaint." *Id.*; *see also Diaz v. Caliber Home Loans, Inc.*, No. 1:24-CV-00307-MSM-AEM, 2025 WL 1503846, at *2 & n.2 (D.R.I. May 27, 2025) (same).

3 at 2. That surplus "was never paid," the dispute over it being central to the case. (ECF No. 8 ¶ 14.)

Since then, Mr. Norton has contacted R.I. Housing via telephone twice: first on October 21, 2024, and then on November 19, 2024. (ECF No. 8 ¶¶ 13, 19.) The first call lasted six minutes, though Mr. Norton notes that R.I. Housing "failed to log the call or make any notation in the account regarding the inquiry," raising concerns for him about its "record-keeping and responsiveness to borrower concerns." (ECF No. 8 ¶ 13.)

During the second call, Mr. Norton "requested that the representative write a simple note in his account stating that he called and was of the opinion that RI Housing might be breaking the law." *Id.* ¶ 19. In his version of the events, the representative "became upset and began to argue with" Mr. Norton. *Id.*

No matter, the representative did make the note that he requested. (ECF No. 8-4 at 2.) An entry in the mortgage's "Notes and Memos" page dated 11/19/2024 summarized the phone call and explained that Mr. Norton "argued" with the representative, "stating that RI Housing was up to funny business" and that Mr. Norton "would be calling the attorney general." *Id.* (capitalization removed). The entry also stated that the representative advised Mr. Norton that she did "not believe" that the $3,902.91 "belonged to him," but that she would research it further. *Id.* (capitalization removed). The entry detailed the steps she took to do so. *Id.*

On November 19, the Nortons also filed a complaint against R.I. Housing with the Consumer Financial Protection Bureau ("CFPB"). ECF No. 8 ¶ 16; *see also* No. 8-

3

5 at 1–2. R.I. Housing responded on November 26, explaining that the "funds do not belong to Mr. Norton." *Id.* at 4. Instead, the $3,902.91 overage was the result of an "internal accounting error." *Id.* The error, in R.I. Housing's view, arose due to a mistake involving a "VA funding fee" that Mr. Norton had allegedly financed at the closing of his mortgage.[2] *Id.* Further, it explained, "No funds that should have been applied to his principal balance were credited to his escrow account, so there was no impact to the interest he paid on his mortgage," the upshot being that "there was no impact to the proper working or balancing of his account." *Id.* The Nortons responded in the CFPB portal that the explanation "makes no sense at all," given that the escrow account "IS" the taxes and insurances account and that the $3,937.50 VA funding fee is "not what" Mr. Norton "was disputing." *Id.* at 5. Instead, he was disputing the $3,902.91 amount, and it was unclear if it "will be returned to him or not." *Id.*

Next, on November 20, the Nortons submitted a Qualified Written Request ("QWR") to R.I. Housing. (ECF No. 8 ¶ 20.) It requested "all written records, including account notes up to the date of the request." *Id.* R.I. Housing responded (ECF No. 8-4), and the Nortons "reviewed the provided records, which did not reveal any deposit from any entity or person into Plaintiffs' escrow account at closing, during closing, or after closing." (ECF No. 8 ¶ 20.) To the Nortons, the records "seem incomplete regarding the Notes and Memos on Account section," but Mr. Norton was denied "an electronic copy of the entire account record" after a follow-up request. *Id.*

---

[2] The Nortons vigorously dispute this, saying that they did not finance the fee and instead paid it upfront. (ECF No. 18 at 2.) The Court does not see the correct answer to that dispute as relevant to the resolution of the Motion.

4

Finally, the Nortons sent a demand to R.I. Housing for damages, which "was ignored." ECF No. 8 ¶ 21; *see also* No. 8-8. The Nortons "ultimately ceased requesting further explanations" from R.I. Housing because of "their perception that RI Housing was unwilling, incapable, or intentionally deceptive in addressing the matter." (ECF No. 8 ¶ 22.)

So the Nortons sued R.I. Housing, who now moves to dismiss the Nortons' Amended Complaint under Rule 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), the Nortons must lay out a "plausible claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In other words, they must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In evaluating a claim's plausibility, the Court must "assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008). "But the Federal Rules do not require" the Court "to credit a complaint's conclusory statements without reference to its factual context." *Iqbal*, 556 U.S. at 686.

The Nortons bring four claims. Count I alleges that R.I. Housing mismanaged the escrow account and thus breached its fiduciary duty to the Nortons. (ECF No. 8 ¶¶ 24–27.) Count II alleges five violations of the federal Real Estate Settlement Procedures Act ("RESPA"), largely centering around the same escrow account issues

and R.I. Housing's failure to respond adequately to the Nortons' inquiries. *Id.* ¶¶ 28–30. Count III alleges that the incident inflicted emotional distress, and Count IV seeks punitive damages. *Id.* ¶¶ 32–38.

The Court's analysis starts and ends with Count II, the RESPA claim. "RESPA sets forth specific procedures that a mortgage loan servicer must follow in responding to a borrower's request for information." *Fitch v. Fed. Hous. Fin. Agency*, No. 18-cv-00214-JJM-PAS, 2021 WL 4901909, at *4 (D.R.I. Oct. 21, 2021), *report and recommendation adopted*, No. 18-cv-00214-JJM-PAS, 2022 WL 159287 (D.R.I. Jan. 18, 2022). The statute's purpose "is to promote transparency and communication between borrowers and servicers of mortgage loans by requiring that servicers must respond to certain types of written inquiries from borrowers regarding the servicing of their loans within a set amount of time." *Id.* "To comply with a REPSA request from a borrower who has provided a statement of reasons for his belief that the account is in error, the servicer must either correct the error or provide a statement of reasons why the account is correct." *Id.* So "RESPA requires that servicers provide borrowers with information, not that they necessarily accept a borrower's assertion of error and correct it." *Id.* And "to establish the right to recover for a RESPA violation, the borrower must show that that servicer failed to comply with these requirements and that the borrower suffered actual damages caused by the violation." *Id.* at 5 (citing 12 U.S.C. § 2605(f)).

The Nortons allege five violations of RESPA. In their view, R.I. Housing first failed "to provide timely and accurate escrow account disclosures," in violation of 12

U.S.C. § 2605(g).  (ECF No. 8 ¶ 30(a)).  Second, R.I. Housing moved funds "without justification or violation," showing a commingling of funds that "is prohibited under RESPA regulations."  *Id.* ¶ 30(b).  Third, R.I. Housing failed "to adequately respond" to the Nortons' QWR dated November 20, 2024.  *Id.* ¶ 30(c).  Fourth, R.I. Housing provided "conflicting and unsupported explanations for the funds movement," constituting "a pattern of noncompliance with RESPA's requirements for transparency and accountability."  *Id.* ¶ 30(d).  Fifth, R.I. Housing failed "to correct errors promptly," violating the statutory requirement of a response needed in 30 days.  *Id.* ¶ 30(e).

The Nortons' two claims about escrow management both fail under the statute.  RESPA provides some requirements about escrow management in 12 U.S.C. § 2605(g), but the Nortons' allegations—even accepted as true—do not state a violation of those requirements.  First, the section regarding escrow mismanagement provides:

> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due.

12 U.S.C. § 2605(g).  To make out an allegation under this requirement, the Nortons would need to allege that the servicer failed to "make payments from the escrow account" for the purposes identified "in a timely manner as such payments become due," among other things.  *Id.*  They do not allege as much, so that cannot be grounds for relief.  The escrow management section also provides, "Any balance in any such

account that is within the servicer's control at the time the loan is paid off shall be promptly returned to the borrower within 20 business days or credited to a similar account for a new mortgage loan to the borrower with the same lender." *Id.* The Nortons have not alleged that the mortgage is paid off, triggering the balance payment required. Without alleging a violation of one of these two provisions, the Court cannot see how R.I. Housing mismanaged the escrow account in a way that violated the statutory duties RESPA imposes on it.

Nor are the Nortons' three remaining federal claims about R.I. Housing's response to the inquiries viable under RESPA.[3] First, the "adequate response" claim. "The statute provides that an adequate response can either be a correction of the alleged error, or a reasonable investigation and statement of reasons why the servicer believes that the account is correct." *McGahey v. Fed. Nat'l Mortg. Ass'n*, 266 F. Supp. 3d 421, 442 (D. Me. 2017). This case is the latter type, where the documents that the Nortons provided—particularly the Notes and Memos—show R.I. Housing's

---

[3] The Nortons do not specifically argue that R.I. Housing's actions violated "Regulation X," the CFPB's regulations to implement RESPA. As the *Fitch* court explained, "12 C.F.R. § 1024.35 provides additional details governing error resolution procedures, while 12 C.F.R. § 1024.36 addresses requests for information." *Fitch*, 2021 WL 4901909, at *5 (D.R.I. Oct. 21, 2021). There is little caselaw in the First Circuit on how to apply the regulation, but from the available caselaw (and mindful that the Nortons did not raise the issue themselves), the Court sees no plausible violation of it. "Under Regulation X, servicers have a duty to perform a reasonably thorough investigation in response to a borrower's Qualified Written Request or Notice of Error, and to provide a reasonably thorough response to a borrower's questions and concerns." *McGahey v. Fed. Nat'l Mortg. Ass'n*, 266 F. Supp. 3d 421, 440 (D. Me. 2017). For the same reasons that it did not violate RESPA, R.I. Housing did not flout Regulation X.

reasonable investigation. (ECF No. 8-4 at 2.) That investigation included pausing the surplus payment for additional research after Mr. Norton first called on October 18, an investigation conducted on November 19 simultaneous with and continuing after his phone call, continued follow-up with supervisors and confirmation with other departments, and a response to his CFPB complaint within a week. *Id.* The Nortons may disagree with the outcome of the investigation and the reasons provided but recall that "RESPA requires that servicers provide borrowers with information, not that they necessarily accept a borrower's assertion of error and correct it." *Fitch*, 2021 WL 4901909, at *4.

And although the Nortons vaguely allege that the records provided, particularly the Notes and Memos document, "seem incomplete," (ECF No. 8 ¶ 20), that alone cannot save their claim. *See, e.g.*, *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (explaining that "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 n.5 (2007)). The emails that the Nortons provide show that the full record was sent via mail, even though it was not sent electronically at Mr. Norton's preference. (ECF No. 8-9 at 2–3.)

Second, the "pattern of noncompliance" claim fails on its face because the Nortons have only alleged at most two instances of noncompliance, both particular to their case: failure to adequately respond to the QWR and to the CFPB complaint. (ECF No. 8 ¶¶ 16, 20.) The statute requires much more. "To show a pattern or

9

practice" under RESPA, the Circuits to address the question have held that "a plaintiff must show that noncompliance with the statute was the company's standard operating procedure—the regular rather than the unusual practice." *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 720 (8th Cir. 2018); *see also Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 523 (10th Cir. 2013) (affirming dismissal under the same provision because the plaintiff failed "to allege any violations with respect to other borrowers"); *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1247 (11th Cir. 2016) ("Though there is no magic number of violations that create a 'pattern or practice of noncompliance,' courts have held that two violations of RESPA are insufficient to support a claim for statutory damages.") (collecting cases). The Nortons have not alleged as much.

Finally, the "failure to correct errors promptly" claim fails because it misunderstands the law. Again, "RESPA requires that servicers provide borrowers with information, not that they necessarily accept a borrower's assertion of error and correct it." *Fitch*, 2021 WL 4901909, at *4. R.I. Housing is not liable, at least under RESPA, for failing to correct an error it does not accept as true, and the record shows a reasonable investigation and response conducted within 30 days of written requests. *See, e.g.*, ECF No. 8-4 at 2; No. 8-5 at 4. That is true even if the response does not answer every single question that the Nortons asked and address every single error that the Nortons allege.

All five of the Nortons' RESPA claims thus fail under Rule 12(b)(6). Count II is accordingly DISMISSED WITH PREJUDICE.

That leaves the Nortons' breach of fiduciary duty claim (Count I), their claim for infliction of emotional distress (Count III), and their claim for punitive damages (Count IV).[4] The Court sees these all as state-law claims. *See, e.g.*, *Palmisano v. Toth*, 624 A.2d 314, 320 (R.I. 1993) (discussing a state-law cause of action for punitive damages).

Under 28 U.S.C. § 1367(c)(3), the Court "may decline to exercise supplemental jurisdiction" over remaining claims if it "has dismissed all claims over which it has original jurisdiction." Whether the Court "should decline supplemental jurisdiction depends on a pragmatic and case-specific evaluation of a variety of considerations, including the interests of fairness, judicial economy, convenience, and comity." *Desjardins v. Willard*, 777 F.3d 43, 45 (1st Cir. 2015) (cleaned up). In fact, the First Circuit has held that, following dismissal of all federal claims, "it is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve" those values. *Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017).

---

[4] R.I. Housing argues that Count I necessarily fails because it is titled "mismanagement of escrow funds," and that is not an independent cause of action. (ECF No. 17 at 13–14.) But the Nortons' pro se status "militates in favor of a liberal reading" of the Complaint. *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 13 (1st Cir. 2004). And the substance of that claim is clearly a common-law breach of fiduciary duty claim. The Nortons allege that R.I. housing "owed" them "a fiduciary duty to properly manage their escrow account in compliance with industry standards and federal law" and that they "breached" this duty in several ways. (ECF No. 8 ¶¶ 25–26.) Whether these allegations constitute a valid claim for breach of fiduciary duty under Rhode Island law is not for this Court to say, aside from determining that R.I. Housing has not breached the specific requirements of RESPA.

11

Application of those values here counsels against retaining jurisdiction. The First Circuit has noted that comity "is a particularly important concern" in the analysis. *Camelio v. Am. Fed'n,* 137 F.3d 666, 672 (1st Cir. 1998). And the Supreme Court has explained that "needless decisions of state law" in federal court "should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (cleaned up). "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed," or in this case remanded, "as well." *Id.* Fairness, judicial economy, and convenience all weigh against retention too, given (1) that this case is in an early stage, (2) that remand would impose little prejudice on the parties, and (3) that state courts are better equipped to handle the remaining state-law questions. *Camelio*, 137 F.3d at 672.

That last point—about open questions of state law—is particularly salient as to the breach of fiduciary duty claim. Whether the escrow mismanagement alleged here breaches a common-law fiduciary duty is, as far as the Court can tell, an open question in Rhode Island. *See Camelio*, 137 F.3d at 672 (noting that one factor counseling "against retention of jurisdiction" over the state-law claims is whether the claims "raise substantial questions of state law that are best resolved in state court"). The Court will thus decline to retain jurisdiction over the remaining state-law claims.

To summarize: the Court GRANTS R.I. Housing's Motion to Dismiss (ECF No. 16) as to Count II. The Court declines to assert supplemental jurisdiction as to

the remaining claims, so it will REMAND them to state court for resolution. Accordingly, the Court also declines to address the Nortons' Motion for a Jury Trial (ECF No. 14). This matter is remanded to the Rhode Island Superior Court sitting in Providence, for the counties of Providence and Bristol.

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

June 17, 2025